ROBERT T. BROOK *et al.* Admrs.

*v.*

ALLEN M. SLATEN.

1. CLAIMS AGAINST ESTATE — *allegation and proof must correspond.* Where a claim filed against an estate is for money due under an alleged specific contract between the claimant and the deceased, proof of the admissions of the deceased of obligations or undertakings, on his part, to the claimant, other and different from the claim filed, will not sustain the claim, and it should not be allowed on such proof.

2. SAME—*should be closely scrutinized.* A claim filed by a grandson against his grandfather's estate, for a large amount, on account of an alleged agreement by the grandfather to pay him for changing his residence, should be closely scrutinized by the jury passing upon the same, and all the facts and circumstances should be carefully weighed and considered.

APPEAL from the Circuit Court of Jersey county; the Hon. CYRUS EPLER, Judge, presiding.

Messrs. WARREN & POGUE, for the appellants.

Messrs. SNEDEKER & HAMILTON, for the appellee.

Mr. JUSTICE BREESE delivered the opinion of the Court:

It appears, from this record, that, at the August term, 1875, of the county court of Jersey county, sitting in probate, Allen M. Slaten presented a claim against the estate of Isaac N. Piggott, deceased, represented by Robert T. Brock and Mary Jane Brock, his administrators, of which the following is a copy, and which was then filed:

*Estate of* I. N. PIGGOTT,
              *To* A. M. SLATEN, *Dr.*

To amount due A. M. Slaten on a contract made by said I. N. Piggott with said A. M. Slaten, to remove with his family to the city of East St. Louis, in the county of St. Clair, in the State of Illinois, and that he, said Piggott, would compensate A. M. Slaten therefor, in the year A. D. 1873,—$1200.

The claim being resisted by the administrators, a trial was had before the judge, resulting in a judgment in favor of Slaten against the estate for the sum of eleven hundred and twenty-five dollars, in the seventh class, and that the plaintiff pay the costs.

The administrators appealed from this judgment, to the circuit court, and, during the pendency of the cause, the court permitted the plaintiff to file an additional account, to embrace a claim for interest, to the amount of one hundred and twenty dollars.

The defendants then filed an account, on behalf of the estate,

against the plaintiff, made up of a large number of items, and amounting, in the aggregate, to two thousand seventy-five dollars and sixty cents.

The cause was submitted to a jury, the trial resulting in a verdict for the plaintiff for one thousand three hundred and twenty dollars. Various reasons were assigned, on a motion duly entered, for a new trial, which the court denied, and rendered judgment on the verdict.

The deceased, Isaac N. Piggott, died at the house of one of his daughters, in the city of St. Louis, in the State of Missouri, on the 11th of February, 1874, at the advanced age of eighty-one years. The plaintiff, and claimant, is a grandson, and seems, up to the fall of 1873, to have been a pet of his aged grandfather, whom, being a man of wealth, he was disposed to advance in life, and, no doubt, in those garrulous moments which occur to most aged men, the old gentleman had declared what great things he was to do for this grandson. It does not appear, by anything in this record, that the grandson was in any business whatever. The first we hear of him was as a resident of the town of Otterville, in the county of Jersey, contemplating the establishment there of a soap factory. His grandfather, being the owner of an interest in the city of East St. Louis, then quite a prosperous town, and promising, from its position, great future advancement, and desirous, no doubt, of having his property there improved and attended to, he himself being too far advanced in years to give it the necessary care and attention,—prompted as well by a desire to aid his grandson as his own interests, it can not be questioned, if we credit the testimony of Hammison, Fogue and plaintiff's father, John W. Slaten, old Dr. Piggott, when on a visit to Jersey county, in September, 1873, did make propositions to his grandson to abandon his proposed enterprise at Otterville and come to East St. Louis with his family. These witnesses do not concur as to the precise terms of the proposition, or as to the extent and character of the inducements offered. Fogue says Dr. Piggott called on him in East St. Louis, in October, 1873, and asked him to make estimates for building a store-

house with residence above—a two-story building; that he wanted to build it for his grandson, whom he expected there to reside with him.   The estimate was made as to the cost, except the soap factory—that, they "lumped off."   The doctor said he wanted to get Mack Slaten to come there—that he would have to offer him inducements—was going to build the building for his grandson—expected to make his home with his grandson in East St. Louis, and have his grandson assist him in his business — witness did build the building, and Mr. Slaten was there—have seen him go in and out—can't say whether he made his home there or not.

Hammison says he had a conversation with Dr. Piggott during the fall of 1873—saw him on the street and talked with him—he wished witness to see Mack Slaten, and tell him what he would give him to move to East St. Louis—have been negotiating with him to move down, and live with him as long as he lived—tell him, said the doctor, "I will give him all my interest in my land at the mouth of the Illinois river.   In addition to that, I will build, upon one of my lots in East St. Louis, a house big enough for both families to live in—I will make him a warranty deed, to be good at my death." Witness delivered the message.   This occurred, as we understand the witness, at Otterville, in Jersey county, at the time John W. Slaten alludes to in his testimony.   Mr. Slaten says, at the September term, 1873, of the Jersey circuit court, Dr. Piggott was there, with whom he had three different conversations in relation to his son, and he offered various inducements.   The doctor offered to give plaintiff five acres of ground about five or six miles from East St. Louis, on the line of the Belleville railroad, near Centreville station, and one-fourth of an acre of the land that had been cut through to drain the sloughs, for the purpose of situating the soap factory.   On the 1st of November, 1873, witness was in East St. Louis, and went out with them to Centreville.   The old gentleman told his grandson to select his ground, and he selected five acres near the bluff, and half an acre of slough.   A change, however, was made, Dr. Piggott saying that the tract at the bluff

was too small to divide, and that he had made arrangements to buy an acre of a man to whom he had sold. We understand no selection was then made.

The witness further says, in the conversation at Jerseyville, Dr. Piggott wished to remove from where he lived, and was to build a house in East St. Louis suitable for both of them. In that conversation, the doctor said he was to give Mack fifty dollars a month to attend to his business whilst he was getting the factory up, and upon his removal, that house to be Mack's. There was no dimension, size or price set to the building. As to the soap factory, the doctor said he would let him have the ground along Cahokia creek, and thought it would be better if Mack would accept the change. Witness further testified that the doctor and his wife were to have rooms in the house he was to build, and Mack was to have it at the time of the doctor's death. Mack was to have, besides, fifty dollars a month, and his expenses for coming down and attending to the doctor's business.

It appears, from the testimony of this witness, that Dr. Piggott lived in East St. Louis, and his wife in the city of St. Louis with one of her daughters. He also said the doctor made Mack a deed for the lot he held, in trust, the consideration expressed therein being $8380, and the doctor said Mack had paid for it, but he is ignorant when or how Mack got the money to make the payments—said Mack received papers the doctor handed to him—he also made a deed to Mack for the Camden lots, which we understand to be the land at the mouth of the Illinois river—there were twelve lots.

It seems it was the intention of A. M. Slaten, called by the witnesses Mack Slaten, to go into the business of soap making at Otterville, in Jersey county, in company with one William T. Noble, a resident of that place, and he is sworn and examined as a witness to sustain plaintiff's claim of a contract with his deceased grandfather. Noble states he had several conversations with Dr. Piggott, in East St. Louis, which place he visited several times to see about the soap-making enterprise. He testifies, in the first conversation he had with the

doctor, in the last of October or first of November, 1873, the grandfather and grandson then living in East St. Louis, in the house built for the doctor, into which they were moving, the doctor told witness he had got Mack down there, and was going to do well by him—was going to build him a house and set him up in business making soap.

We think this testimony clearly establishes the proposition that overtures had been made by Dr. Piggott to his grandson, and inducements held out to him to remove from Otterville to East St. Louis, but no two of the witnesses concur as to the nature of those inducements. They are stated differently by the several witnesses, and they, neither of them, establish plaintiff's claim as he himself alleges it. In his declaration, or account, filed with the probate court, he claims under a specific contract, made by the deceased with him, to pay him one thousand two hundred dollars, in consideration the plaintiff would remove with his family to East St. Louis in the year 1873. This is the substance and ground work of the claim, and it is apparent no witness establishes it, and, on the principle that the allegations and proofs must correspond, the plaintiff has failed in his action.

But considering it as true that the nature of the inducements held out to plaintiff was as stated by the witnesses, we think it is proved Doctor Piggott, in his lifetime, carried them all out and performed them substantially.

If we take Fogue's version as the true one, we have his authority for saying the doctor carried out his promise—he built the house, and the grandfather and grandson occupied it.

If we take Hammison's version, the same is the result. The doctor did convey to plaintiff the land at the mouth of the Illinois river; he did build a house upon one of his lots in East St. Louis, big enough for both families to live in, the old gentleman having his rooms in it, and living with his grandson's family, warmed by the same heating stove, and taking their meals at the same table, as we should infer from the testimony.

If the version of plaintiff's father is to be received as the

true one, then it is so wholly different from the claim presented by the plaintiff as to forbid its allowance. He says plaintiff was to have fifty dollars per month for attending to the doctor's business; he was to have ground on which to erect a soap factory; he was to build a house suitable for both of them; that the doctor and the old lady would have rooms in the building, and at the time of the doctor's death, Mack was to have the house—none of these is claimed by the plaintiff in his account filed.

The father, John W. Slaten, states distinctly, on cross-examination, that Dr. Piggott told Mack if he would go down there (East St. Louis,) and attend to his business, he would give him fifty dollars a month and pay the expenses of moving his family, and would give him five acres of ground on the bluff that was on the south-east side of the slough that runs down there. This was the whole contract.

The testimony of Noble is mainly relied on to prove a specific acknowledgment of indebtedness by Doctor Piggott to his grandson, of twelve hundred dollars. This is not made a part of plaintiff's claim, and therefore could not be recovered in this action. But taking it as an item of account, is it not strange and incomprehensible that plaintiff himself should not, in his testimony, have even alluded to it, and furnished some information of the transaction out of which the indebtedness arose? He never, at any time, claimed that his grandfather was indebted to him on any other contract than on the one he set out in his claim before the court of probate. Then he gives us to understand that, to remove with his family to East St. Louis, his grandfather was, by contract, to pay him, as compensation, twelve hundred dollars. We have seen, none of the witnesses, Fogue, Hammison or J. W. Slaten, testify to any such thing, nor does Noble. He states distinctly that, at a saloon on or near Broadway, in the city of St. Louis, he had an interview with Dr. Piggott, to which he was invited by the doctor, at which the doctor said he was to furnish plaintiff money to go into the soap business—his share needed to go into business; that he owed plaintiff twelve hundred dollars, which he

would pay as soon as witness returned from the south, and that it ought to have been paid before. This witness is positive this conversation took place in this saloon on December 31, 1873. About this he can not be mistaken. This is the precise date, the very day on which this acknowledgment was made, if made at all, and so the plaintiff charges, as he claims interest from that day, namely, from January 1, 1874, as his account filed shows. Now, there can be no doubt, from the testimony of Dr. J. I. Piggott, who was with him at a Christmas dinner, December 25, 1873, that he was then in his eighty-first year, and very feeble; so feeble that they had to assist him up and down stairs, and continued to sink until February 11, 1874, when he died; was there every day or two after Christmas until he died; don't think he was out of his house after Christmas.

Howard Y. Lane, a son-in-law of Dr. Piggott, testifies that the doctor was taken sick on the 24th of December, 1873, and died on the 11th of February, 1874; was making his home with witness, and came down stairs to dinner on the next day (Christmas), and was helped up stairs, and never went out until he was carried out, a corpse. His daughter, Mrs. Brock, states, the 24th day of December was the last day he was out of the house, until he was carried out, a corpse; he died on the 11th of February, 1874.

This testimony is uncontradicted, and clearly shows that, on the 31st of December, 1873, the deceased, Dr. Piggott, could not have had this interview in a beer saloon on Broadway, about which Noble testified, and the same must be a mistake. If such an acknowledgment was made at that time by the doctor, it is very strange the plaintiff did not make it the groundwork of his action. It would have been a simple account for money due and unpaid, for, by Noble's statement, this twelve hundred dollars had no relation whatever to the removal of plaintiff to East St. Louis, and did not grow out of any one of the contracts supposed to be testified to by the other witnesses.

This is a claim, and a large one, against the estate of a dead

19—82D ILL.

man, in whose lifetime not a whisper of it is heard, and to which the plaintiff then made no pretensions. It is almost impossible, if such a claim really existed, that the plaintiff should not have mentioned it to some one; that his father should not have known something about it; that the plaintiff himself should have been willing to establish it by his own oath, or at least that he should have been able to supplement Noble's testimony by showing out of what the indebtedness arose—of what items it consisted.

There is not the slightest proof in this record that plaintiff, prior to his removal to East Louis, was ever in a position to render his grandfather any valuable services, or loan him money, or be useful to him in any way, and it is in proof, after he moved to East St. Louis, he was in the employment of his grandfather not more than one month, for which, according to the testimony of his father, J. W. Slaten, he was to receive fifty dollars.

We have gone thus fully into the testimony on behalf of the plaintiff, for the purpose of showing that the jury did not weigh well all the circumstances of the case, and too readily yielded to the demands of a living claimant.

The jury seemed to have ignored all the claims set up by the administrators, as just credits, such, for instance, as the check on the Continental Bank for fifty dollars, which, we understand, was drawn by Dr. Piggott, in favor of plaintiff, and indorsed by him, for fifty dollars, on which he received the money. If the check was drawn by Dr. Piggott, and indorsed as stated, the presumption is, it was a gift, or a payment of some indebtedness. There is no proof it was a gift to plaintiff, and the reasonable inference is, it was paid on account of their dealings, whatever they may have been, and for which the estate was entitled to credit. The second instruction given on this point for plaintiff was erroneous, and should not have been given. So of the deed for the lot for the consideration of one thousand three hundred and eighty dollars. The date of that deed is November 27, 1873, at which time it is quite evident plaintiff had not the means to pay for it, and

the manner in which he obtained possession of it, and sent it to Belleville for record, does not appear so well from the testimony of Brock. If plaintiff did pay for this lot, we are constrained to believe, from all the testimony, it was conveyed to him by the doctor in fulfillment of his promise to aid him if he would remove to East St. Louis; that one dollar was ever paid for it in money, there is not a particle of evidence to show; nor is it shown plaintiff had any resources he could draw upon for money.

The jury trying this cause do not seem to have regarded with much favor any of the claims set up by the administrators as proper credits against the plaintiff's claim. Though sworn to by a disinterested witness, Brock, who, though the son-in-law of deceased, had no claim to a distributive share of the estate, the jury preferred relying on the testimony of the plaintiff, he deposing in his own interest, and claiming against a dead man. We should think a jury, in all such cases, would be disposed to place most reliance on a disinterested witness. They can not be too cautious in scrutinizing claims of this nature. They are daily made, and juries should be careful, and weigh well all the facts.

We have examined this record with care, and, excluding Noble's testimony, there is nothing satisfactorily proved in this record to satisfy us the estate of Isaac N. Piggott is indebted in the sum of thirteen hundred and twenty dollars, or in any other sum, to the plaintiff, and that the judgment he has obtained for that sum is unjust, and ought to be reversed. We do not think the case has been fully explained to the jury, and well understood by them. Some explanation should be given of the time when and how, on what account, the deceased owed his grandson the twelve hundred dollars testified to by Noble. Some explanation should be given of the time when, and the manner in which plaintiff paid his grandfather one thousand three hundred and eighty dollars for the lot in East St. Louis, and on what consideration he received from his grandfather the Moss note for ninety-three dollars, and the Veitsh note for forty-six dollars.

The case, as it stands, has an unfavorable aspect, and we are of opinion justice would be best subserved by sending the cause to another jury, for further investigation, and for that purpose the judgment is reversed, and the cause remanded for a new trial.

*Judgment reversed.*